# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 6, 2014

## STATE OF TENNESSEE v. DONALD WAYNE McCALL

**Appeal from the Circuit Court for Crockett County**
**No. 42565   Clayburn Peeples, Judge**

---

**No. W2013-01501-CCA-R3-CD - Filed June 30, 2014**

---

The Defendant, Donald Wayne McCall, was convicted by a Crockett County Circuit Court jury of rape of a child, a Class A felony, and two counts of aggravated sexual battery, Class B felonies. *See* T.C.A. §§ 39-13-522, 39-13-504(a)(4) (2010). The trial court sentenced the Defendant as a Range II, multiple offender to forty years for child rape at 100% service and to twenty years for each aggravated sexual battery conviction at 100% service. The trial court ordered consecutive sentences, for an effective eighty-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by failing to exclude evidence related to one victim's credibility, and (3) the trial court erred by permitting the State to impeach him with his previous convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Patrick Dollar, Jackson, Tennessee, for the appellant, Donald Wayne McCall.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Garry Brown, District Attorney General; and Hillary Lawler Parham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant was convicted of the rape and aggravated sexual battery of J.M., the Defendant's niece, and the aggravated sexual battery of K.P., the Defendant's great niece. At the trial, J.M.'s father, who was also K.P.'s grandfather, testified that on July 4, 2011, he hosted a family gathering at his house. He said that sometime after the July 4 holiday, he saw

the Defendant, who was his brother, and the victims in the swimming pool. He said that J.M. was sitting on the Defendant's left leg and that K.P. was sitting on the Defendant's right leg. He told the victims to get off the Defendant and to swim or to get out of the pool. He said he left the area and began working in the yard. He said he saw the victims and the Defendant alone in the pool once after that day.

On cross-examination, J.M.'s father testified that the first time he saw the Defendant and the victims in the swimming pool was on Saturday after the July 4 holiday. He said that the second time he saw them in the pool was about one week later and that after that day, the victims no longer wanted to swim. He said that when he learned of the allegations, he talked to two county sheriff's deputies, who called Detective Curtis. He said he took J.M. to the hospital to be examined about two or three months after he learned of the allegations. He said that he took J.M. to a woman he identified as Ms. Anita for counseling but that he did not like Ms. Anita's talking to J.M.

J.M. testified that she was born on August 2, 1998, and that she was twelve years old in July 2011. She identified her parents and said that K.P. was her niece and that the Defendant was her uncle, although she had known the Defendant less than one year in July 2011. She said that although she did not recall the date on which the incidents occurred, they occurred after July 4.

J.M. testified that on the first day she, K.P., and the Defendant were in the swimming pool, they played and splashed the Defendant. She said the Defendant asked them, "You want to know what happens when you splash me?" She said she splashed him again, and the Defendant grabbed her breast. She did not know if K.P. saw the Defendant grab her breast. She said they continued to play and splash the Defendant, and he grabbed her breast "most of the time." She thought the Defendant should not have grabbed her there and said he also touched her "crotch area" over her bathing suit. She said the first time the Defendant touched her private area was when she held onto the side of the pool. She said they were playing a game in which she and K.P. held onto the side of the pool, and the Defendant attempted to pull them from the side. She recalled holding onto the side of the pool and the Defendant's reaching and touching her private area.

J.M. testified that the Defendant also touched her private area when she sat on his knee. She said the Defendant had his hands under the water and touched her and K.P. "down there." She said she saw the Defendant touch K.P. She said that at one point, she put on goggles to determine if the Defendant was touching K.P. She said that before she went under the water with the goggles, she suspected the Defendant was touching K.P. because K.P. yelled, "[I]t was an inappropriate place to touch." She said that the Defendant left the pool to smoke a cigarette and that she and K.P. left a few minutes later. She said that the

Defendant asked her if she knew not to tell anyone and that she "nodded her head yes." She said K.P. was a few feet away.

J.M. testified that she and K.P. talked about what happened and discussed whether to report the Defendant's touching them but that they decided not to tell anyone because they feared J.M.'s father would not believe them. She said that previously, the Defendant told her father that she made a "smart comment" to the Defendant, that she denied making the comment, and that her father believed the Defendant.

J.M. testified that the following day, the Defendant came to her house to assist her father repair something. She said that she and K.P. were swimming when the Defendant arrived, that the Defendant entered the pool after he finished helping her father, and that "it happened again." She said the Defendant placed her on his lap and touched her private area with his hand beneath her bathing suit. She said the Defendant inserted his finger into her vagina "a couple of times." She said her father began mowing the yard after he and the Defendant finished the repairs. She did not recall the Defendant's saying anything during the incident and said K.P. was on the other side of the pool at the time. She said that the Defendant attempted to place her hand on his crotch a couple of times but that she "jerked" her hand away. She said they all left the pool because it began to rain. She did not see the Defendant touch K.P. that day and said the Defendant drove K.P. home.

J.M. testified that she and K.P. discussed again whether they should tell anyone about the Defendant's touching them but denied that they discussed the details of what occurred. She said that the following Saturday, the Defendant came to her house to repair her sister's Jeep. She said her mother sent her outside to ask the Defendant a question. She said that she complied and that when she returned, her mother asked why she was hateful to the Defendant. She said her mother stated, "It's not like he's ever touched you or anything like that, right?" She said she broke down, cried, and told her mother what occurred. She said that her mother called her father and that she and her mother calmly walked to the car, left the house, and met K.P. and her mother at the library.

On cross-examination, J.M. testified that she wore a one-piece swimsuit when the incidents occurred. She agreed the incidents occurred on a Wednesday and a Thursday and denied they occurred on a Saturday. Regarding the first incident, she agreed the Defendant first touched her when they were splashing around in the swimming pool. She did not know how many times the Defendant touched her breast and said he touched her private area three or four times. She denied knowing why she and K.P. stayed in the pool that day but said they first thought it was an accident and "freaked out" when the Defendant touched their crotch areas.

J.M. testified that the Defendant wore his "street" clothes in the swimming pool on the second day. She said she and K.P. stayed in the pool because J.M.'s father was outside mowing the lawn and thought the Defendant would stay away from them. She described how the Defendant moved her swimsuit to the side and "put his hand in." When asked why she did not leave, she said she was scared, did not know what to do, and froze. She said she was "pretty sure" the Defendant attempted to put her hand on his crotch area because he pulled her hand to "his crotch area." She said that her hand touched his jeans and that she quickly jerked her hand away. She denied getting into the pool with the Defendant after the incidents occurred.

J.M. testified that she put on the goggles before she and K.P. sat on the Defendant's knees. She did not know of any incidents involving K.P. after the first day. When confronted with her previous testimony, she denied saying that she and K.P. decided not to tell anyone for any other reason than fearing J.M.'s parents would not believe them. She denied K.P. said "it" did not happen to her. She denied she thought her parents would not believe her because she had been in trouble at school.

J.M. testified that she and K.P. were in the swimming pool a couple of hours each day. She said that K.P. wore shorts over her swimsuit on the first day and that she wore a swimsuit with a skirt attached to it. She said she was not wearing shorts when the Defendant inserted his finger into her vagina but did not recall exactly what she wore. She knew the Defendant touched her first because he had already touched her breast and crotch area before K.P. yelled that the Defendant was being inappropriate. She agreed she told her mother what occurred in October 2011. She said she and K.P. agreed never to talk about the incidents and to attempt to forget what occurred. She said she told her mother what occurred because there was something about the way her mother asked her. She said she liked to write stories, including fantasies.

K.P. testified that she was born on November 24, 1999, that she was eleven years old at the time of the incidents, and that the Defendant was her great uncle. She said that in July 2011, she had known the Defendant for about one year. She said that a few days after July 4, 2011, the Defendant touched her. She said that she, J.M., and the Defendant were in J.M.'s swimming pool when he touched her. She said that the Defendant told her that he was tired from playing in the pool and that although he did not leave the pool, he placed her on his lap. She said J.M. was on the other side of the pool at the time. She said the Defendant touched her crotch area but denied he moved his hands around. She said the Defendant also grabbed her breasts after she splashed him. She denied the Defendant touched her anywhere else that day.

-4-

K.P. testified that the Defendant touched her on other occasions but denied that he attempted to make her touch him. She said the Defendant told her not to tell anyone about the touching. She said that after they got out of the pool, the Defendant took her home. She did not recall anyone else being at the house that day.

K.P. testified that the following day, she returned to J.M.'s house and swam in the pool. She said the Defendant touched her breast and crotch area like he did the previous day. She recalled J.M.'s father mowing the lawn when they were in the pool. She said she saw the Defendant touch J.M. when she put on goggles and went underwater, which she did to determine what the Defendant was doing to J.M. She said that she saw the Defendant touch J.M.'s crotch area underneath J.M.'s swimsuit. She said the Defendant told them not to tell anyone about the incident. She denied that she and J.M. talked about the details of the incident but said they discussed if they should tell someone. She said that J.M. wanted to tell someone but that K.P. thought it was an accident. She said she did not want to tell anyone. She stated that she ultimately told her mother about the incidents when her mother asked if the Defendant had ever touched her. She said that after she told her mother what occurred, she and her mother met J.M. and J.M.'s mother at the library.

On cross-examination, K.P. testified that she did not recall whom the Defendant touched first, but she thought he touched her first. She said she and J.M. were sitting on the Defendant's knees at the same time. She said that they were in the swimming pool for about two or three hours but that it was "almost all day." She clarified that it seemed as though they were in the pool for two or three hours but that it was all day. She said the incident on the first day occurred late in the day. She agreed she did not tell anyone about the incidents and said nothing seemed inappropriate to her.

K.P. testified that at the end of the first day, she and J.M. became hungry and left the swimming pool and that the Defendant remained in the pool. She said they "kind of" got out of the pool because of the Defendant's touching them. She said the Defendant did not touch her when he drove her home that day. She said that the Defendant was living with her family at the time of the incidents, that they played cards in his room, and that he never touched her when they played cards.

K.P. testified that on the second day, the Defendant was not in the swimming pool when she and J.M. entered the pool. She said the Defendant was at J.M.'s house to assist J.M.'s father repair the lawnmower. She agreed she invited the Defendant to swim with them because she thought his touching them the previous day was an accident. She agreed, though, she used goggles to determine if the Defendant was touching J.M. the same way he was touching her. When presented with her previous testimony, she stated that she did not recall saying she saw the Defendant touch J.M. when she was wearing goggles underwater,

rather than she put on the goggles with the purpose of determining if the Defendant was touching J.M.

K.P. testified that she never got in the swimming pool with the Defendant after the incidents. She said she never told anyone what occurred until her mother approached her about it in October 2011. She denied talking to J.M. in October about the incidents. She agreed she continued to think in October that the touching was accidental. She did not recall her previous testimony in which she stated that the Defendant attempted to make her touch him. She denied her father or J.M.'s father ever swam with her and J.M.

J.M.'s mother, who was K.P.'s stepgrandmother, testified that she was home the two days in which J.M. and K.P. swam with the Defendant. She said she first learned of the allegations in October 2011 when the Defendant was at her house repairing a car. She asked J.M. to go outside and ask the Defendant a question related to car parts. She said J.M. did not want to talk to the Defendant, although she told J.M. to do it anyway. She said J.M. returned, was upset, and did not want to go outside anymore. She said she was confused and asked J.M. why she was behaving this way. She said that she told J.M., "It's not like he's ever touched you or nothing," and that J.M. began to cry. She said that she asked J.M. if the Defendant had touched her and that J.M. cried. J.M. told her that the Defendant touched her between the legs when J.M.'s mother was inside the house. She said J.M. told her that the Defendant touched K.P., too.

J.M.'s mother testified that she called her husband, who called K.P.'s mother. She denied J.M. and K.P. talked from the time J.M. told her about the allegations to K.P.'s telling her mother about the allegations. She said that after she and J.M. met K.P. and her mother at the library, they went to the police station. She said that after the July 4 holiday, J.M. was different when the Defendant came to her house. She said that anytime the Defendant came to their house, J.M. put on long sleeves and pants. She said J.M. refused to swim, although she loved swimming, and disrespected the Defendant.

On cross-examination, J.M.'s mother testified that she convinced J.M. to go swimming with her once after the incidents occurred. She said she equated J.M.'s changing her clothes when the Defendant was at their house and her disrespect toward the Defendant to J.M.'s adolescent attitude. She agreed J.M. and K.P. talked to her after their trial testimony but denied discussing the substance of their testimony. She said that she recalled walking outside the house during the relevant days and that she thought J.M., K.P., and the Defendant were having a good time. Although she could not recall whether it was the first or second day, she said J.M. entered the house and stated she was done with swimming.

Upon this proof, the Defendant was convicted of rape of a child of J.M., aggravated sexual battery of J.M., and aggravated sexual battery of K.P. The trial court sentenced the Defendant as a Range II, multiple offender to forty years for the child rape conviction and to twenty years for each aggravated sexual battery conviction. The court ordered consecutive sentences, for an effective eighty-year sentence at 100% service. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his convictions. He argues that the victims' testimony was "filled with inconsistencies and lack of memory" and that the jury convicted the Defendant because of the "nature of the charges." The State responds that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Rape of a child, in relevant part, is the "unlawful sexual penetration of a victim by the defendant . . . , if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522 (2010). Aggravated sexual battery is defined, in relevant part, as the "unlawful sexual contact with a victim by the defendant" when the victim is less than thirteen (13) years old. *Id.* § 39-13-504(a)(4) (2010).

In the light most favorable to the State, the record shows that the evidence is sufficient to support the Defendant's convictions. Regarding the rape of a child conviction, J.M. testified that she was twelve years old in July 2011 when the incidents occurred. J.M. said that on the second day the Defendant placed her on his lap and inserted his finger into her vagina "a couple of times." She said the Defendant moved her bathing suit to the side and "put his hand in."

Regarding the aggravated sexual battery of J.M., the State elected the Defendant's touching her on the second day. J.M. testified that on the second day, the Defendant placed her on his lap and touched her private area with his hand beneath her bathing suit. Further,

K.P. testified that she put on goggles and saw the Defendant touch J.M.'s crotch area under J.M.'s swimsuit.

Regarding the aggravated sexual battery of K.P., the State elected the Defendant's touching her on the first day. K.P. testified that she was eleven years old in July 2011. She said that on the first day, the Defendant told her that he was tired from playing in the swimming pool and sat her on his lap. She said the Defendant touched her crotch area. K.P. also stated that the Defendant grabbed her breasts after she splashed him. J.M. heard K.P. yell, "[I]t was an inappropriate place to touch," put on goggles, and saw the Defendant touching K.P.'s crotch area.

We note that although the Defendant argues that inconsistencies in the victims' testimony supports his contention that the evidence is insufficient, the jury as the tier of fact resolved any conflicts in the evidence and weighed the witnesses' credibility. *See Bland*, 958 S.W.2d at 659. The Defendant is not entitled to relief on this basis.

**II**

The Defendant contends that the trial court erred by excluding evidence related to J.M.'s credibility. He argues that a school report related to J.M.'s making inappropriate sexual comments to a male classmate was admissible and relevant to J.M.'s credibility and that the report showed J.M. previously "fabricated a story concerning alleged sexually inappropriate behavior." The State responds that the court did not abuse its discretion by excluding the evidence. We agree with the State.

Relevant evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. A trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury[.]" *Id*. at 403. Questions regarding the admissibility and relevancy of evidence lies within the trial court's discretion, and this court "does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

At a jury-out hearing, defense counsel told the trial court that he had received J.M.'s school records and asked the court to determine whether the records could be used during his cross-examination of her. The prosecutor told the court that the records showed that in April 2011, J.M. told a boy at school that "all she needed was a dark room, duct tape, a rope, and a knife to rape him." Counsel argued that at the preliminary hearing, J.M. testified that she

did not report the Defendant's conduct because her father would not believe her. It was counsel's belief that this school incident was the reason for her failure to report the alleged incidents relevant to this case. The State argued that the records were irrelevant and that alternatively, the probative value of the school incident was substantially outweighed by the unfair prejudice. The trial court found that the incident was not relevant to the State's case-in-chief and excluded its admission. The court told counsel to raise the issue again if the testimony developed in such a manner that made the report relevant.

On cross-examination, counsel asked J.M. if she failed to report the Defendant's touching her because she got into trouble at school. She denied that her getting into trouble was related to her failure to report the touching. Before counsel could question J.M. about the substance of the school incident, the prosecutor objected. At a bench conference, counsel told the trial court that the incident was relevant because "[s]he's telling a story about why she didn't think her dad would believe her, and I --." The court interrupted and found that "it had nothing to do with her getting in trouble." The court found that the school incident was not relevant at that point in the trial. The school incident was not addressed again.

We conclude that the trial court did not abuse its discretion by finding the school incident irrelevant. The incident was not relevant to determining whether it was more or less probable that the Defendant committed the offenses of which he was charged. We note that although the Defendant argues that the incident showed J.M. previously "fabricated a story concerning alleged sexually inappropriate behavior," nothing in the record shows that the J.M. fabricated anything during the school incident. To the contrary, the record shows she made the sexual comments to a fellow classmate and was disciplined for the comments. The Defendant is not entitled to relief on this basis.

**III**

The Defendant contends that the trial court erred by permitting the State to impeach him with his previous convictions for escape in January 1994, second degree murder in July 1985, sexual battery in 1980, petit larceny in 1977, felonious jail escape in June 1977, petit larceny in June 1977, assault with the intent to commit a felony in October 1976, attempt to commit a felony in January 1974, and Texas convictions for assault in 1972 and robbery in 1970, had he chosen to testify. He argues that the court failed to provide specific facts and circumstances in finding that the interest of justice was served and that the probative value substantially outweighed its prejudicial effect pursuant to Tennessee Rule of Evidence 609. The State responds that the court properly permitted the State to impeach the Defendant with his previous convictions. We conclude that the Defendant is not entitled to relief.

Pursuant to Tennessee Rule of Evidence 609, the credibility of the accused may be attacked by presenting evidence of a prior conviction. The prior conviction must be for a felony offense or for a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). Less than ten years must have elapsed between the date the accused was released from confinement and the commencement of the prosecution, unless the court determines "in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." *Id*. at 609(b). Also, the State must give reasonable written notice of the impeaching conviction before trial, and the trial court must find that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. *Id*. at 609(a)(3); *see State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999); *State v. Farmer*, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992). This requires the court to analyze the impeaching conviction's relevance to credibility and to determine the similarity between the current offense and the offense underlying the impeaching conviction. *State v. Thompson*, 36 S.W.3d 102, 109 (Tenn. Crim. App. 2000); *see Mixon*, 982 S.W.2d at 674. The previous felony conviction "need not involve dishonesty." *Thompson*, 26 S.W.3d at 109. The trial court's decision to allow a prior conviction under Rule 609 will not be reversed on appeal unless the trial court abused its discretion. *State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

Before the trial, the State sought permission to impeach the Defendant with his previous criminal convictions. Counsel objected to the admission of the convictions because they occurred beyond the ten-year requirement pursuant to Rule 609. The State argued that the convictions were admissible under Rule 609 because specific facts and circumstances surrounding the convictions substantially outweighed the prejudicial effect, which made the ten-year rule inapplicable.

The trial court found that the ten-year rule did not apply if the convictions were supported by specific facts and circumstances and if the probative value of the convictions substantially outweighed the prejudicial effect. The court found that the previous sexual battery conviction was inadmissible but that the remainder of the convictions were admissible if the Defendant chose to testify. The court stated the convictions, except the sexual battery conviction, established a pattern of criminal activity, which reflected on the Defendant's credibility as a witness. The court stated that the State had a right to present the convictions for the jury's consideration.

Although the Defendant claims that the trial court failed to provide specific facts and circumstances upon which it relied to conclude that the interests of justice were served and that the probative value substantially outweighed their prejudicial effect, he does not explain in his brief what, if anything, the trial court should have done. We note that although the record fails to include evidence regarding the sentences the Defendant received relative to

-10-

his previous convictions, counsel told the court, "Now, the State, I think, is taking the position that he's only been out of jail for a year and a half or thereabout . . . he hasn't been out of jail for more than ten years." Although counsel disputed that the Rule 609 intended for all of the Defendant's previous convictions to be admissible, his comments imply that at least some of the Defendant's convictions did not exceed the ten-year limitation. In any event, the record shows that the trial court ruled on the admissibility of the convictions as though the convictions exceeded the ten-year limitation.

Pursuant to Rule 609(b), after finding that a conviction exceeds the ten-year limitation, a trial court must determine "in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Tenn. R. Evid. 609(b); *see id.* Advisory Comm'n Cmts. The record is absent any specific facts and circumstances surrounding the convictions, but we note that at the pretrial hearing the court found that the ten-year rule did not apply, in part, if the convictions were supported by specific facts and circumstances. The issue before the court at that time was whether the convictions substantially outweighed their prejudicial effect. In that regard, the court found the convictions established a pattern of criminal activity, which reflected on the Defendant's credibility as a witness.

Although the trial court did not individually analyze the relevance of each conviction to the Defendant's credibility, we conclude that the trial court did not err by finding that the Defendant's previous convictions established a pattern of criminal activity that reflected on his credibility as a witness. The record reflects that the credibility of the witnesses was critical in the jury's determination of guilt. As counsel concedes in his brief, this case "boiled down to 'she said/he said.'" If the Defendant had testified, his credibility would have been a critical issue for the jury to determine, and his previous criminal convictions indicate an inability to conform his conduct to the requirements of the law. *See State v. Donald Wayne Marshall*, No. E1999-00922-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App. Feb. 18, 2000) (concluding that although previous convictions might not reflect upon a defendant's honesty, previous convictions might still reflect upon the inability to conform conduct to the requirements of the law); *see also State v. Timothy Aaron Baxter*, No. W2012-02555-CCA-R3-CD, slip op. 11 (Tenn. Crim. App. Jan. 3, 2014) (permitting the admission of multiple convictions under Rule 609, in part, because the defendant's credibility was the "paramount factual issue in the case").

Our supreme court has recognized that multiple previous convictions are more probative of credibility than a single previous conviction. *See State v. Waller*, 118 S.W.3d 368, 373 (Tenn. 2003) (noting that the defendant's three previous drug-related convictions were "more probative of credibility than a lesser number"). Likewise, this court has stated that when a defendant's credibility is a key issue for the fact finder to determine, "the

probative value of past actions of poor moral character bec[o]me particularly important." *State v. Jeffery Yates*, No. W2003-02422-CCA-R3-CD, slip op. at 14-15 (Tenn. Crim. App. July 21, 2009) (concluding that the trial court did not abuse its discretion by permitting the state to impeach the defendant regarding ten previous convictions, including especially aggravated kidnaping, aggravated kidnapping, attempted aggravated robbery, five aggravated assaults, and drug-related offenses).

Although the trial court failed to address whether the convictions were similar to the present offenses, the record shows that the allowed conviction offenses were not similar to the offenses on trial. Similar convictions can generally be excluded to avoid the danger that a jury will improperly consider a similar previous conviction as "evidence of the propensity of the defendant to commit the [charged] crime." *Waller*, 118 S.W.3d at 373. Because the Defendant's previous convictions and the current offenses are dissimilar, the unfair prejudicial effect of the convictions was minimal. Thus, although the trial court failed to engage in a full analysis pursuant to Rule 609, we conclude that the trial court did not abuse its discretion by permitting the State to impeach the Defendant with his previous convictions had he chosen to testify at the trial. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE

-12-